J-S96044-16 & J-S96045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF S.R.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.A.S., FATHER | |
| | No. 1256 WDA 2016 |

Appeal from the Order Dated August 1, 2016
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 68 of 2015

| | |
|---|---|
| IN RE: ADOPTION: OF S.R.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.S., NATURAL MOTHER | |
| | No. 1257 WDA 2016 |

Appeal from the Order Entered August 1, 2016
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 68-2015

BEFORE:  BENDER, P.J.E., BOWES, J., and SOLANO, J.

MEMORANDUM BY SOLANO, J.:          **FILED FEBRUARY 06, 2017**

S.A.S. ("Father") and D.S. ("Mother") (collectively, "Parents") appeal from the August 1, 2016, orders involuntarily terminating their parental rights to their biological child, S.R.S., born March 2013 ("the Child").  Upon careful review, we affirm.

Two days after the Child was born, a referral was made to the Westmoreland County Children's Bureau ("the Agency") that Mother was not bonding with the Child, was easily frustrated with the Child, and would not feed the Child unless someone asked her to do so. N.T., 5/12/16, at 64. At that time, Father had not yet seen the Child or seen Mother since the Child's birth.

On April 17, 2013, a second referral was made to the Agency that Mother was "limited" and could not retain parenting information.[1] N.T., 5/12/16, at 64-65, 70. The next day, a third referral made claims of medical neglect, but the Agency deemed these claims of medical neglect to be unfounded.

On June 12, 2013, a fourth referral indicated that there was a Megan's Law offender residing in Parents' home; the Agency explained to Parents that the Megan's Law offender should not be alone with the Child or be caring for the Child. N.T., 5/12/16, at 65. On June 24, 2013, the Agency discovered that the offender was still in the home as a caretaker. *Id.* At that time, in order to ensure the Child's safety, the Agency privately placed the Child with her paternal grandparents, where she has remained since that time. *Id.* at 65, 69.

---

[1] As discussed below, Parents have untreated cognitive development and mental health issues.

On November 19, 2013, the Child was adjudicated dependent on November 19, 2013.[2]  N.T., 5/12/16, at 65, 69.  According to the orphans' court, this decision "was based on Parents' inability to care for the [C]hild, due to their lack of stable and clean housing, lack of budgeting and home maintenance skills, lack of both hands-on and theoretical parenting skills, and unaddressed mental health needs."  Orphans' Ct. Op., 9/15/16, at 3.  Parents were granted supervised visitation at this time.  *Id.*

Parents have occupied four residences throughout the Child's placement with the Agency.  N.T., 5/12/16, at 69-70.  Even when the Child's paternal grandparents were paying for some of the utilities in Parents' home (from April 17, 2013, to May 4, 2015), Parents failed to pay for other utilities.  Parents have not complied with home maintenance throughout this dependency case.  *Id.* at 70.

Since July 2013, Parents have been offered a myriad of services by the Agency, including a detailed treatment plan, in order to facilitate their ability to reunify with the Child.  N.T., 11/24/15, at 34.  Specifically, Father began parenting classes but, by December 2013, was discharged from that program for failure to attend.  *Id.*  Although Father completed a different parenting class, that course had no hands-on component or curriculum involving child mental development, as recommended by the Agency.

---

[2] Docket No. CP-65-DP-68-2015.

Father was also unsuccessfully discharged from an anger management course and a "fatherhood initiative" class. *Id.* at 34-35. Additionally, Parents were offered budgeting classes but declined; they never engaged in budgeting. N.T., 5/12/16, at 70-71; N.T., 11/24/15, at 85.

Father's employment has been inconsistent – he has had multiple jobs and a period of unemployment. N.T., 5/12/16, at 81. The first time that Father provided paystubs to the Agency to verify his employment was November 2015. N.T., 11/24/15, at 85. Mother has had one source of employment during the Child's dependency case, delivering newspapers, but she had to leave this employment when she broke her foot. *Id.* at 114.

Parents suffer from untreated mental health and cognitive development issues. Although Father initially submitted to a mental health evaluation on July 25, 2013, he refused to comply when further treatment was recommended because he contended that such treatment was unnecessary. Ex. WCCB-1,[3] 11/24/15 (Father's Parenting Assessment by Carol A. Patterson, M.Ed.), at 1; N.T., 11/24/15, at 7; N.T., 5/12/16, at 67. On February 25, 2016, Father agreed to a reevaluation of his mental health, and outpatient therapy was recommended to him. *Id.* Nevertheless, he has not complied with counseling. *Id.*

---

[3] "WCCB" signified exhibits from the Westmoreland County Children's Bureau – *i.e.*, the Agency.

Soon after the Child's placement, Mother submitted to intellectual and psychiatric evaluations, in which it was discovered that Mother's intellectual functioning is in the extremely low range of ability, which indicates deficiencies in insight, judgment, and abstract thinking. N.T., 5/12/16, at 87. As a result of Mother's low cognitive functioning, parenting instruction was tailored to address these needs, including behavioral modeling components and simplified instruction, and various other accommodations to the offered services were made by the Agency in a similar vein. N.T., 11/24/15, at 50. However, Mother's parenting progress has been extremely limited, and she does not retain information. *Id.*

Parents' visits with the Child initially occurred at the paternal grandparents' home but were eventually moved to a private institution, the Monessen Family Center ("MFC"), due to Parents' – particularly, Father's – inappropriate behavior and activities unrelated to the Child. As the orphans' court explained:

> Father often loudly used inappropriate language around the children present . . . , and he displayed observable, inappropriate sexual behaviors towards other parents in the group. . . . Although Mother has made some progress in empathizing with the [C]hild and it is obvious that Mother loves the [C]hild, Father continues to display inappropriate emotional reactions to the [C]hild; on numerous occasions when initiating visits, Father fails to show any affection, or even greet or acknowledge the [C]hild.

Orphans' Ct. Op., 9/15/16, at 4, 7. At MFC, Father had "modified monitored visits" with the Child, where supervision occurred only sporadically. N.T.,

11/24/15, at 30, 69, 111. During Father's visits, despite his emotional distance, he was able to feed the Child and to change her diaper. *Id.* at 111. However, staff at MFC expressed concerns for the Child's safety when she was alone with Mother. Visits only with Mother (without Father present) were always completely supervised. Orphans' Ct. Op., 9/15/16, at 7-8.

The Child interacted with Parents at visits and was often excited to see them, especially Mother. Nevertheless, on various occasions, the Child displayed an unwillingness to attend visits. For example, on January 6, 2016, the Child was "adamant" that she did not want to visit with Mother and "was crying so hard she couldn't catch her breath." N.T., 5/12/16, at 13, 50.

Over the course of the Child's placement and Parents' supervised visits, Parents have consistently brought age-inappropriate toys for the Child and have failed to recognize the developmental stages and limitations of the Child, despite repeated instruction from supervisors at MFC.

Over the 34 months from the Child's placement to the orphans' court's orders terminating parental rights, visitation never moved beyond monitored visitation with Father and completely supervised visitation with Mother.

On July 7, 2015, the Agency filed a petition for involuntary termination of Parents' parental rights. Hearings were held on November 24, 2015, and May 12, 2016. Father had not seen the Child between August 21, 2015, and

November 9, 2015, but he visited the Child a week before the first hearing date.  N.T., 11/24/15, at 25, 60.

Between the first and the second hearing dates, on January 20, 2016, three female MFC social workers had an appointment to review Parents' residence.  N.T., 5/12/16, at 25.  After they knocked, they thought they heard someone inside the home say, "Come in."  *Id.*  When they entered, Father "flew out of the dining room," and "forcefully sa[id]," "'You don't enter my house until I tell you.'"  *Id.* at 26-27.  When the social workers explained that they thought they heard someone inviting them inside, Father said, "'I didn't,'" and "wouldn't let [them] get beyond the door."  *Id.* at 26. The MFC workers then left but had been able to observe that there was a "smell[y] . . . dirty" turtle in the living room.  *Id.*

In March 2016, Father attended three of the nine scheduled visits with the Child, and Mother attended four of the nine scheduled visits.  N.T., 5/12/16, at 30.  In April 2016, both Parents attended four of the eight visits. *Id.*

After both hearings, by orders dated August 1, 2016, the orphans' court terminated Parents' parental rights to the Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b).  On August 16, 2016, Parents filed separate timely appeals.

Father presents one issue for our review:

Did the [orphans'] court err in terminating Father's parental rights despite evidence that an alternative form of parenting instruction was needed?

Father's Brief at 4.

Mother presents two issues for our review:

1.    Was clear and convincing evidence presented to show that termination was warranted pursuant to 23 Pa. C.S.A. Sections 2511(a)(2), 2511(a)(5), 2511(a)(8), and 2511(b)?

2.    Did the [orphans'] court err in terminating Mother's parental rights despite evidence that reasonable services to achieve reunification between [M]other and the [C]hild were not provided and that alternate form(s) of parenting services were needed?

Mother's Brief at 4.

We consider Parents' issues together in light of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are satisfied. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

The orphans' court found that there was sufficient evidence to terminate Parents' parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and 2511(b). We will affirm if we agree with the orphans' court's decision as to any one subsection of 23 Pa.C.S. § 2511(a) and its decision as to Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004); *see In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). Here, we affirm the orphans' court's decision to terminate Parents' parental rights under subsections 2511(a)(2) and (b):

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*   \*   \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), (b).  Parental rights may be terminated under

Section 2511(a)(2) if three conditions are met:

(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Geiger*, 331 A.2d 172, 174 (Pa. 1975).[4]

---

[4] The language in Section 2511(a)(2) is the same as that of its predecessor, Section 311(2) of the Adoption Act of 1970, which was cited in *Geiger*, 331 A.2d at 174.  *See In re A.D.*, 93 A.3d 888, 896 (Pa. Super. 2014) (re-affirming *Geiger* test in terminating parental rights pursuant to Section 2511(a)(2)).

On appeal, Father argues that the evidence does not support termination under Section 2511(a)(2), because,

[a]lthough this termination is based upon a number of grounds, the issues underlying each of these grounds are rooted in Father's failure to make progress with the service providers, in particular, Monessen Family Center.

The record in the termination proceedings is rife with acknowledgements that Father had a terrible working relationship with the Monessen Family Center and, in particular, Kathy Menzler[, a supervisor at MFC]. . . . No attempt was made to provide a different, individual plan of treatment for Father despite these glaring issues.

Father's Brief at 8-9.

Mother claims that the evidence does not support termination under Section 2511(a)(2) because "the basis for termination pursuant to the aforementioned legal grounds were based on Mother's failure to thrive and progress with the **sole** service provider for Mother, namely, the Monessen Family Center." Mother's Brief at 9 (emphasis in original). Mother continues, "The [orphans'] court erred in terminating [her] parental rights due to Westmoreland County Children's Bureau's failure to provide additional services and/or an alternative service provider despite evidence of conflict in the provider-client relationship as well as Mother's noted lack of progress." *Id.*

A review of the record demonstrates that the Child was taken into care by the Agency when she was only three-and-a-half months old, after four separate referrals to the Agency, N.T., 5/12/16, at 64-65, 69, thus

- 11 -

substantiating a clear, repeated incapacity or refusal to provide the Child with essential parental care. *See* 23 Pa.C.S. § 2511(a)(2) ("repeated and continued incapacity . . . or refusal of the parent has caused the child to be without essential parental care"); *see also Geiger*, 331 A.2d at 174. Over the 34 months of the Child's placement, the conditions and causes of Parents' inability to care for the Child, including their lack of stable and clean housing, budgeting, home maintenance skills, and parenting skills, combined with their unaddressed mental health and development needs, *see* Orphans' Ct. Op., 9/15/16, at 3, were never remedied and extremely little, if any, progress was made in any of these areas by Parents. N.T., 11/24/15, at 7, 50; N.T., 5/12/16, at 67, 69-71, 87. *See* 23 Pa.C.S. § 2511(a)(2) ("the causes of the incapacity . . . or refusal cannot or will not be remedied"); *see also Geiger*, 331 A.2d at 174.

As for Parents' claims that they needed new or additional services, such an assertion is not an excuse for their failure to remedy the causes of their inability to perform their role as parents. "The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided." *In re A.L.D., Jr.*, 797 A.2d 326, 340 (Pa. Super. 2002). As the orphans' court explained, the current action is analogous to *In re R.M.G.*, 997 A.2d 339, 351 (Pa. Super.), *appeal denied*, 12 A.3d 372 (Pa. 2010):

> [In *R.M.G.*,] a mother's parental rights were terminated when, "despite receiving years of [agency] services, Mother did not

- 12 -

progress to unsupervised visitation." 997 A.2d 339, 351 (Pa. Super 2010). The Court noted that because the mother was not even able to parent the children during a ninety (90) minute visit in a controlled environment, it was unlikely that she would ever be able to assume full custody. *Id.* at 354. In the instant case, over the course of years, Mother has not progressed past the initially ordered supervised visitation, and Father has not progress past monitored visitation in a controlled environment. . . . [T]he likelihood of [Parents] ever being able to parent the [C]hild in a full time, unsupervised situation is extremely low, and so termination is appropriate.

Orphans' Ct. Op., 9/15/16, at 12. As in ***R.M.G.***, this record substantiates the orphans' court findings of clear and convincing evidence that Parents' conduct satisfies the statutory grounds for termination under subsection 2511(a). ***See*** 23 Pa.C.S. § 2511(a)(2); ***L.M.***, 923 A.2d at 511.[5] Accordingly, the issues raised by Parents on appeal relating to 23 Pa.C.S. § 2511(a) are without merit.

With respect to Section 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***In re C.M.S.***, 884 A.2d

---

[5] The record also supports the orphans' court's findings under 23 Pa.C.S. § 2511(a)(5), (8). ***See*** Orphans' Ct. Op., 9/15/16, at 12. The Child was two months old when she was removed from Parents on June 24, 2013. Orphans' Ct. Op., 9/15/16, 1-2, 12; N.T., 5/12/16, at 65, 69. The petition for involuntary termination was filed on July 7, 2015. Thus, the Child has been "removed from the care of the [P]arent[s] by the court or under a voluntary agreement with an agency for a period of at least six months." 23 Pa.C.S. § 2511(a)(5). Additionally, "12 months or more have elapsed from the date of removal or placement." ***Id.*** § 2511(a)(8). And, as noted above, the conditions which led to Child's removal continue to exist and have not been remedied by Parents.

1284, 1287 (Pa. Super. 2005) (citation omitted). The orphans' court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

On appeal, Father makes no argument as to Section 2511(b) that is separate and distinct from his contention under Section 2511(a) — specifically, that the orphans' court erred in terminating his parental rights without first offering an alternative service provider. Father's Brief at 8. We have rejected that argument.

With respect to Section 2511(b), Mother argues that "[t]he [orphans'] court erred in failing to acknowledge Mother's demonstrated bond with the [C]hild." Mother's Brief at 11. Mother is inaccurate: the orphans' court did not fail to acknowledge any bond between Mother and the Child; the orphans' court recognized that "[t]here does appear to be some emotional bond between [the Child] and [Parents], especially with Mother." Orphans' Ct. Op., 9/15/16, at 13. The orphans' court further appreciated that the Child knows who Parents are and "is often happy to see them." *Id.*

However, the orphans' court also found that the Child "expresses no hesitation about leaving [Parents] and returning to her primary caregivers, her paternal grandparents, upon conclusion of visitation, often expressing equal, if not stronger excitement at their arrival." Orphans' Ct. Op., 9/15/16, at 13. According to the orphans' court, the Child "does not appear to experience any emotional disturbance caused by Parents' absence, as evinced by her lack of concern with long periods between visits." *Id.* Occasionally, the Child "has indicated angry resistance to visits . . . indicating that the visits may actually cause the [C]hild stress." *Id.*

Hence, the orphans' court has "discern[ed] the nature and status of the parent-child bond." *C.M.S.*, 884 A.2d at 1287. We agree with the orphans' court that the evidence supports its conclusion that the bond between Mother and the Child is "only a 'loose' bond," Orphans' Ct. Op., 9/15/16, at 13, and that there will be no "effect on the [C]hild" by "permanently severing any such bond." *L.M.*, 923 A.2d at 511.

Additionally, the Child is thriving in her current placement with her paternal grandparents. As the orphans' court remarked:

> [The Child] has established a strong, healthy parental bond with the [paternal g]randparents, and appears to be hitting all appropriate developmental milestones in their care. [Paternal g]randparents have provided a stable and consistent home environment for the [C]hild. [The Child] has been in [the] Agency['s] placement for almost the entirety of her life, and termination of [Parents'] parental rights (and the concurrent termination of [the] Agency['s] involvement) would allow the [C]hild to finally be released from [the] Agency['s] custody and to progress in her life outside the dependency system. Under

[paternal g]randparents' care, [the Child] has progressed from an infant who was failing to thrive, to a bright, happy, and intelligent toddler.

Orphans' Ct. Op., 9/15/16, at 13. Consequently, this placement has afforded the Child permanency for a substantial part of her young life and has fulfilled "the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).

Accordingly, we conclude that the orphans' court did not abuse its discretion in holding that the Child's "developmental, physical, and emotional needs would best be served by the termination of Appellants' parental rights." Orphans' Ct. Op., 9/15/16, at 13. The record supports the orphans' court's view that the involuntary termination of Parents' parental rights will serve the developmental, physical, and emotional needs and welfare of the Child pursuant to Section 2511(b).

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/6/2017